UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DTW MARKETING RESEARCH GROUP, INC., <br><br> Plaintiff, <br><br> vs. <br><br> THE VOXX GROUP, LLC d/b/a PHARMA VOXX, HEALTH IQ, LLC, XiQ, LLC, JOHN DOES 1-99 and JANE DOES 1-99 <br><br> Defendants. | Civil Action No. 2:09-cv-06302 (SRC)(MAS) <br><br> Civil Action <br><br> Motion returnable: April 5, 2010 |

**PLAINTIFF DTW MARKETING RESEARCH GROUP, INC.'S BRIEF IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
OR TRANSFER VENUE**

**WOLFF & SAMSON PC**
One Boland Drive
West Orange, NJ 07052
(973) 325-1500
Attorneys for Plaintiff
DTW Marketing Research Group, Inc

On the Brief:
Adam K. Derman, Esq.
Melissa A. Salimbene Esq.

1223800.6

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

    A.     Background ............................................................................. 3

           1.     The Parties ................................................................ 3

           2.     DTW's Unique Searchable Database Known As CD Promo .................................................................... 3

           3.     Health IQ Contracts With DTW In New Jersey ............................. 6

           4.     Pharma Voxx Creates Competing Product Modeled After DTW's CD Promo .................................................. 7

           5.     Health IQ Unlawfully Accesses DTW's Database In New Jersey ................................................................ 8

    B.     Defendants' Contacts with New Jersey ...................................................... 9

           1.     Pharma Voxx Visits, Advertises And Services Clients In New Jersey .................................................... 9

           2.     Health IQ Contracted With DTW In New Jersey And Fraudulently Accessed DTW's Database That Is Located In New Jersey ............................................... 10

           3.     XiQ Is A Co-Conspirator Or Alter-Ego Of Health IQ and Pharma Voxx ....................................................... 11

LEGAL ARGUMENT .......................................................................................... 12

    POINT I .......................................................................................... 12

THIS COURT HAS PERSONAL JURISDICTION OVER PHARMA VOXX, HEALTH IQ AND XIQ BASED UPON THEIR CONTACTS WITH NEW JERSEY .................................................. 12

    A.     This Court Has Specific Jurisdiction Over Health IQ and XiQ Due To Their Minimum Contacts With New Jersey ........................ 14

    B.     This Court Has General Jurisdiction Over Health IQ Due To Its Continuous And Systematic Activities In New Jersey ........................ 16

    C.     This Court's Exercise Of Jurisdiction Over The Defendants

## TABLE OF CONTENTS (cont'd)

Comports With Traditional Notions Of Fair Play And Substantial Justice .................................................................................... 17

D. Defendants Are Co-Conspirators Or Alter-Egos ....................................... 18

    1. Co-Conspirators ............................................................................ 18

    2. Health IQ And XiQ Are Alter-Egos Of Pharma Voxx........................................................................................................ 20

E. In The Event The Court Finds More Facts Are Needed To Resolve The Issue Of Personal Jurisdiction, The Court Should Order Jurisdictional Discovery ..................................................... 21

POINT II ............................................................................................................... 21

THE DISTRICT OF NEW JERSEY IS A PROPER VENUE, AND DEFENDANT'S MOTION TO DISMISS THIS CASE UNDER THE DOCTRINE OF *FORUM NON CONVENIENS* SHOULD BE DENIED ........................................................................................... 21

POINT III .............................................................................................................. 24

A BALANCING OF THE INTERESTS WEIGHS STRONGLY IN FAVOR OF KEEPING THIS MATTER IN THE DISTRICT OF NEW JERSEY AND THEREFORE DEFENDANTS' MOTION TO TRANSFER TO THE CENTRAL DISTRICT OF CALIFORNIA SHOULD BE DENIED ........................................................... 24

POINT IV .............................................................................................................. 26

DTW SUFFICENTLY PLEADED THE FRAUD AND BREACH OF CONTRACT CLAIMS AGAINST PHARMA VOXX AND ALL CLAIMS AGAINST XIQ, AND THUS, NONE OF THE CLAIMS SHOULD BE DISMISSED ................................................................... 26

CONCLUSION ...................................................................................................... 27

## TABLE OF AUTHORITIES

**CASES**                                                                                     **PAGE**

Banco Popular N. Am. v. Gandi,
    184 N.J. 161 (2005) ...................................................................................................18

Burke v. Quartey,
    969 F.Supp. 921 (D.N.J. 1997) .............................................................. 13, 15, 22-23

Cacioppo v. Pool Mart Servs., Inc.,
    2007 WL 2162427 (App. Div. July 30, 2007) .........................................................21

Calder v. Jones,
    465 U.S. 783 (1984)..................................................................................................14

Carroll v. United Airlines, Inc.,
    325 N.J. Super. 353 (App. Div. 1999) .....................................................................21

Clark v. Burger King Corp.,
    255 F.Supp.2d 334 (D.N.J. 2003) ...........................................................................26

D'Agostino v. Johnson & Johnson, Inc.,
    225 N.J. Super. 250 (App. Div. 988) .......................................................................23

Dept. Of Treasury, Div. of Invest., v. Qwest Commc'n Int'l., Inc
    387 N.J. Super. 487 (App. Div. 2006) .....................................................................19

Gehling v. St. George's Sch. of Med., Ltd.,
    773 F.2d 539 (3d Cir. 1985)......................................................................................16

Granovsky v. Pfizer, Inc.,
    631 F.Supp.2d 554 (D.N.J. 2009) ............................................................................17

Ipoint Ventures, LLC v. Pequot Capital Management, Inc.,
    2005 WL 1828586 (D.N.J. 2005) ............................................................................17

Jumara v. State Farm Ins. Co.,
    55 F.3d 873 (3d Cir. 1995).................................................................................. 25-26

Keeton v. Hustler Magazine, Inc.,
    465 U.S. 770 (1984)........................................................................................... 14-15

Lebel v. Everglades Marina, Inc.,
    115 N.J. 317 (1989) ........................................................................................ 13-14, 16

Maglio & Kendro, Inc. v. Superior Enerquip Corp.,
    233 N.J. Super. 388 (App. Div. 1989) .....................................................................15

## TABLE OF AUTHORITIES

**Page**

Makopoulos v. Walt Disney World, Inc.,
  221 N.J. Super. 513 (App. Div. 1987) .................................................................................21

Matsumoto v. Matsumoto,
  335 N.J. Super. 174 (App. Div. 2000) ..................................................................................19

Miller Yacht Sales, Inc. v. Smith,
  384 F.3d 93 (3d Cir. 2004)............................................................................. 13-14, 17

Morgan v. Union County Bd. of Chosen Freeholders,
  268 N.J. Super. 337 (App. Div. 1993) ..................................................................................27

Mueller v. Seaboard Commercial Corp.,
  5 N.J. 28 (N.J. 1950)............................................................................................20

Ross v. Celtron Intern., Inc.,
  2006 WL 2591083 (D.N.J. Sept. 8, 2006) ..............................................................26

Shutte v. Armco Steel Corp.,
  431 F.2d 22 (3d Cir.1970)................................................................................24, 26

Starr v. Berry,
  25 N.J. 573 (1958) .............................................................................................22

Verizon Online Servs., Inc. v. Ralsky,
  203 F. Supp. 2d 601 (E.D. Va. 2002) ....................................................................19

Waste Mgmt., Inc. v. Admiral Ins. Co.,
  138 N.J. 106 (1995) ...........................................................................................16

World-Wide Volkswagen Corp. v. Woodson,
  444 U.S. 286 (1980)...........................................................................................13

Yocham v. Novartis Pharmaceuticals Corp.,
  565 F.Supp.2d 554 (D.N.J. 2008) ....................................................................24-26

Yousef v. Gen. Dynamics Corp.,
  2010 WL 770488 (App. Div. Jan. 13, 2010) ..........................................................23

1223800.6

## PRELIMINARY STATEMENT

Defendants Health IQ, LLC ("Health IQ"), XiQ, LLC ("XiQ") and the Voxx Group, LLC d/b/a Pharma Voxx ("Pharma Voxx") (collectively "Defendants") -- with clear and definite ties to New Jersey -- have participated in a joint scheme to illegally access and download confidential information from Plaintiff dtw Marketing Research Group, Inc.'s ("DTW") database and use that information to unfairly compete with DTW.   For a period of three years (2004-2007), Health IQ placed multiple orders with DTW for services and documents that were compiled by DTW from its database in New Jersey, and then apparently used this information to start Pharma Voxx, a competing business.   After 2007, rather than legitimately continue to contract with DTW for services and materials, Health IQ illegally accessed DTW's database and downloaded materials therefrom without DTW's authorization (and continued that conduct after being warned by DTW once DTW discovered Health IQ's connection to Pharma Voxx).  Health IQ used an IP address supplied by its parent corporation, XiQ, to access DTW's database from an office Health IQ shares with XiQ and Pharma Voxx.  And, DTW alleges Health IQ provided this misappropriated information to its sister company Pharma Voxx, which has New Jersey clients and is DTW's biggest competitor.  The ties to New Jersey could not be more significant.

Nevertheless, Defendants argue that New Jersey is not a proper venue for resolution of this dispute because, according to Defendants, XiQ and Health IQ are not subject to personal jurisdiction here (Defendants do not dispute this Court's jurisdiction over Pharma Voxx), and because they believe their home state of California would be preferable to litigate this case. None of Defendants' arguments have merit.  First, there can be no question that this Court has both general and specific jurisdiction over Health IQ because it repeatedly ordered products and services from DTW for a three year period and then illegally accessed DTW's database here. This litigation arises directly out of that conduct which had a direct result in New Jersey.  XiQ,

as the parent of Health IQ and Pharma Voxx, provided the support for this conduct, including the office space, employees, information technology support and other administrative support to carry out their activities which were targeted at New Jersey. Additionally, jurisdiction over all three Defendants is proper because they are alter-egos or co-conspirators who worked together to carry out the common scheme to steal DTW's proprietary information and unlawfully compete with DTW. Accordingly, this Court certainly has personal jurisdiction over all three Defendants and Defendants' motion to dismiss for lack of personal jurisdiction over Health IQ and XiQ should be denied.

Defendants have also failed to demonstrate that the case should be dismissed or transferred to the Central District of California because it would be a more convenient forum for Defendants. In addition to the aforementioned conduct, Pharma Voxx regularly travels to New Jersey for conferences, advertises in New Jersey and services New Jersey based clients, which is not surprising given the substantial pharmaceutical presence in New Jersey. As related entities, Health IQ and Pharma Voxx frequently advertise and recruit employees together. In addition, XiQ, while claiming to be just a holding company, recently commenced a lawsuit in New York, thereby confirming that litigation in the area is not too inconvenient for XiQ. Considering all these facts, Defendants' motion to transfer or dismiss should be denied.

Finally, Defendants' arguments that various claims against XiQ and Pharma Voxx should be dismissed lacks merit. DTW has pleaded that XiQ, Pharma Voxx and Health IQ are alter-egos or co-conspirators, allegations which are easily supported by the limited facts gathered to date. As such, the actions by one are attributable to the others. Thus, DTW has sufficiently pleaded conduct by the Defendants for each claim in the complaint, and there is no basis to dismiss any of the Defendants.

2

Based on the foregoing, as will be explained in greater detail below, Defendants' motion to dismiss or transfer should be denied in its entirety.

## STATEMENT OF FACTS

### A.   Background

#### 1.   The Parties

DTW, a New Jersey corporation, is a pharmaceutical and diagnostic industry based market research firm, and the leading provider of a searchable database of promotional items distributed by the pharmaceutical industry.  (See Certification of Adam K. Derman ("Derman Cert.") Exhibit A, Complaint ¶ 1).

Defendants Pharma Voxx, Health IQ and XiQ are California companies that all have the same principal place of business at 770 The City Drive, Suite 7400, Orange, California, 92868, and the same registered agent Daniel Vesely ("Vesely").  (See Defendants' Brief in Support of Motion to Dismiss or Transfer ("Defendants' Brief") at pp. 2-3).  All three Defendants are owned by Vesely and Anthony Page ("Page").  (Id.).  XiQ is the parent or holding company of Health IQ and Pharma Voxx.  (Id.)

#### 2.   DTW's Unique Searchable Database Known As CD Promo

DTW was formed in 1983 and is a market research firm for the pharmaceutical and healthcare industries. (Complaint ¶ 11).  In 1996, DTW launched the first searchable database of pharmaceutical promotional materials specific to the U.S. pharmaceutical industry.  (Complaint ¶ 12). This database is known as "CD Promo."  (Id.). The purpose of the database was to create a single searchable database of all promotional materials regarding pharmaceutical products in order to aid pharmaceutical and advertising companies in researching, analyzing and tracking how pharmaceuticals are marketed, and what advertising and promotional materials are or have

3

been used to market pharmaceutical products. (Complaint ¶ 13). At the time, no other database of such materials existed. (Id.).

Beginning in 2002, DTW expanded the CD Promo pharmaceuticals database to include promotional materials from not only the U.S., but also France, Germany, Italy, Spain, Switzerland, the United Kingdom Canada (2004), Japan (2006) and the Animal Health market in 2007. (Complaint ¶ 14). DTW currently has over 1,000,000 promotional objects and approximately 2.5 million images included in its database, including materials dating back to 1996. (Complaint ¶ 16). The information on CD Promo is updated on a daily basis by DTW employees who compile and scan the promotional material into the database and summarize and categorize the data to make it searchable and understandable by DTW's clients. (Complaint ¶ 17). The compilation of information and the categories of information and summaries that correspond with each item in the CD Promo database are the confidential and proprietary information of DTW available nowhere else other than on CD Promo, which confidentiality is guarded by DTW. (Complaint ¶ 18).

Access to CD Promo is available on an annual subscription basis, which can be tailored to fit each client's particular needs. (Complaint ¶ 19). The annual subscription fee ranges from $500 for a limited subscription to over $200,000 for full access to DTW's database. (Id.). If one of DTW's clients wants to share materials downloaded from CD Promo with a third party entity such as an advertising company hired by the client, DTW requires that third party to enter into a Third Party Agreement with DTW. (Complaint ¶ 25). As an alternative to purchasing a subscription, clients of DTW can also request DTW to compile certain information and images for a page-based fee. (Complaint ¶ 26). Specifically, rather than purchase a subscription and conduct their own searches, DTW will compile information as to a particular pharmaceutical

product, company or medical condition. (Id.). Under such circumstances, DTW charges a fee of

$16 to $18 for each page of United States materials that is downloaded and $26 to $32 for

materials emanating outside the United States, depending upon the delivery time. (Id.).

Upon purchase of a subscription, clients are provided with a unique username and

password; however, access for additional users can be purchased at an additional cost.

(Complaint ¶ 20). When a user logs on to access CD Promo, they must first agree to the CD

Promo Terms of Use and License Agreement by acknowledging a click-through log-in

agreement. The Terms of Use provide, among other things, as follows:

- (i) dtw's CD Promo Database (the "Database") is confidential and proprietary information and/or original work of authorship compiled and owned by dtw, and (ii) Client shall keep in confidence and protect dtw's Database from disclosure to unauthorized parties and restrict its use as provided herein.

- Client agrees to use the Database and all information obtained therefrom solely for its internal professional and/or business purposes and not for any other purpose. Further, the Client shall not: (i) access/use the Database for the benefit of third parties, or (ii) provide any information from the Database to third parties, including without limitation to any third party market research companies, (iii) permit the use, duplication, reproduction, copying or disclosure of the Database and/or the information contained therein, or otherwise make the Database available for any purpose to any unauthorized party, including without limitation to any third party market research companies. For example, and not by way of limitation, Client agrees that it shall not (i) resell information from the Database; (ii) use or allow third parties to use information from the Database for the purpose of compiling, enhancing, verifying, supplementing or deleting from any compilation of information which is sold published, furnished or in any manner provided to a third party, including without limitation to any third party market research companies even if such companies are undertaking market research or other projects for client; or (iii) use the information from the Database in any service or product provided by the Client or any third party, including without limitation to any third party market research companies.

- Client further acknowledges and agrees that it has been furnished with a Password for use by it to access the Database. The Password provides vital security in preventing unauthorized access to the Database and the confidential information contained therein. Client is responsible for keeping and maintaining the security of each Password that is assigned to it and shall have sole and exclusive responsibility for any unauthorized access to the Database that results from Client's failure to keep the assigned Password(s) secure. Client shall be primarily

liable for the acts of omissions of its employees, subcontractors, other agents and/or any such person or entity to whom or to which it disclosed or revealed its Password.

(Complaint ¶ 21).

The CD Promo database includes images of promotional material in viewable and downloadable PDF and JPEG format, which are introduced with a summary cover sheet. (Complaint ¶ 22). The summary cover sheet provides sourcing information for the promotional material that summarizes the key circulation dates, trade name, country of origin, object type, keywords, and a thumbnail image of the promotional material. (Id.). A link accompanying a thumbnail can be clicked on and downloaded, allowing the user to view it as a PDF or JPEG image. (Id.).

Originally, the CD Promo database was contained on a compact disc that was provided by DTW to clients; however, now, authorized users of CD Promo access the CD Promo database by going to DTW's website http://www.dtwresearch.com and signing on with the unique username and password assigned to that particular user. (Complaint ¶ 23). Also, prior to March of 2009, users had to download a proprietary software program called emageX in order to download and view the documents contained on CD Promo. (Complaint ¶ 24). Currently, neither the emageX software, nor any other proprietary software, is required to access CD Promo. (Id.).

### 3.    Health IQ Contracts With DTW In New Jersey

Beginning in 2004, DTW began receiving requests from Health IQ for custom searches of pharmaceutical promotional information and documents. (Complaint ¶ 27). Thus, from 2004 through 2007, and on at least eight occasions, Health IQ contracted with DTW to have DTW perform the service of conducting custom searches and to provide Health IQ with documents and materials. (Complaint ¶ 29; Certification of Pamela Statile ("Statile Cert.") at Exhibit A). For

each of these contracts, Health IQ contacted DTW in New Jersey, for services to be provided by DTW in New Jersey and for materials to be collected and compiled in New Jersey. (Statile Cert. ¶¶ 5-7). As a result of these contracts, DTW provided Health IQ with materials dating back as far as 1999 at a cost of approximately $6,000.00. (Complaint ¶ 29). At the time DTW was providing these materials to Health IQ, DTW was unaware that Health IQ and Pharma Voxx were related entities and alter egos of one another, or that Pharma Voxx was gearing up to be a competitor of DTW. (Complaint ¶ 31; Statile Cert. ¶ 8).

### 4.   Pharma Voxx Creates Competing Product Modeled After DTW's CD Promo

Unbeknownst to DTW, in November of 2005 and while Health IQ was ordering custom searches from DTW in New Jersey, Page and Vesely decided to create a pharmaceutical promotional materials database to compete with DTW's CD Promo. Page and Vesely formed Pharma Voxx, which they claim was launched in 2007 as a wholly owned subsidiary of their company XiQ. (Defendants' Brief at p. 6). Pharma Voxx's database is accessed via the website http://pharmavoxx.com and offers the same type of product as CD Promo, namely, a comprehensive database of pharmaceutical marketing and promotional literature. (Complaint ¶ 33). Indeed, Defendants do not deny that Pharma Voxx's product directly competes with DTW's CD Promo.

Shortly after discovering the Pharma Voxx website, DTW learned that Health IQ and Pharma Voxx had common owners and employees, and were located at the same address. (Complaint ¶ 34). In addition, DTW learned that Pharma Voxx was offering material on its database that dated back to 1999, well before Pharma Voxx's creation, but within the time period of documents provided to Health IQ by DTW. (Complaint ¶¶ 29 & 35). Concerned that Pharma Voxx was using materials in its database that had been provided to Health IQ by DTW, on

February 14, 2008, DTW's counsel sent a cease and desist letter to Health IQ, stating that DTW believed that Health IQ was unlawfully distributing proprietary information obtained from CD Promo by providing that information to Pharma Voxx to use in its competing database. (Complaint ¶ 36; Statile Cert. Exhibit C). In that letter, DTW noted that the information contained in CD Promo, including the documents provided to Health IQ, are DTW's proprietary intellectual property that may not be duplicated, reproduced or distributed without DTW's permission. (Statile Cert. ¶ 12). Health IQ denied that their numerous purchases from DTW over a period of three years were improper. (Complaint ¶ 37).

### 5.   Health IQ Unlawfully Accesses DTW's Database In New Jersey

In late September of 2009, DTW discovered that its database was being accessed from an IP address owned by XiQ and located at its office, which is the same office as Pharma Voxx and Health IQ. (Complaint ¶ 38). Upon further investigation, DTW discovered that two of the usernames and passwords assigned to one of DTW's largest customers were being used from XiQ's IP address and office to access and perform thousands of searches on CD Promo from at least October 2008 through the present. (Complaint ¶ 39). Not only was DTW's database fraudulently accessed, but DTW's proprietary emageX software must have been illegally accessed and utilized by Defendants as well because for the period prior to March 2009, the emageX software was necessary in order to view the documents on CD Promo. (Complaint ¶¶ 24 & 39).

Indeed, Defendants admit that in 2008 and 2009 Health IQ directly accessed DTW's New Jersey based CP Promo database by using the usernames and passwords of one of DTW's clients. (Defendants' Brief at p. 6). Incredibly, this unauthorized access started just nine months after DTW's counsel sent the cease and desist letter to Health IQ. (Statile Cert. at ¶ 13). Health IQ accessed and downloaded approximately 1,647 documents, consisting of over 10,770 pages

8

from DTW's database using XiQ's IP address.  (Complaint ¶ 40).  If these pages had been purchased from DTW, as was previously done by Health IQ, the cost would be over $200,000.00.  (Id.).  The documents accessed and downloaded from the XiQ IP address were inputted on the CD Promo database as early as January of 2000 and as late as June of 2009. (Complaint ¶ 42).  By improperly accessing CD Promo from the XiQ owned IP address, and illegally using DTW's proprietary software, Defendants not only downloaded and obtained confidential information and documents, but they were also able to see the inner workings, organization and structure of DTW's CD Promo database.  (Complaint ¶ 43).

### B.    Defendants' Contacts with New Jersey

Contrary to Defendants' allegations in their moving brief, Defendants have significant contacts with New Jersey.  Notably, the State of New Jersey is considered to be the global epicenter of the pharmaceutical industry (Statile Cert. ¶ 10), and thus it would be inconceivable for Defendants, which are companies who focus on pharmaceutical marketing and research, to allege that they do not have market to or do business here.

### 1.    Pharma Voxx Visits, Advertises And Services Clients In New Jersey

Although Defendants do not dispute that this Court has personal jurisdiction over Pharma Voxx, it is worth describing Pharma Voxx's numerous contacts with this State in light of the overlap and interchangeability between the Defendants.  Pharma Voxx, like DTW, offers a searchable database of pharmaceutical marketing materials and competes with DTW in New Jersey.  (Defendants' Brief at p. 6).   As New Jersey is considered to be the center of the pharmaceutical industry (Statile Cert. ¶ 10), it is not surprising that Pharma Voxx has clients based in New Jersey, a fact Pharma Voxx failed to disclose in its moving brief.  (Statile Cert. ¶ 11).  Additionally, Pharma Voxx regularly markets to, solicits customers and conducts business in New Jersey.  For example, not only does Pharma Voxx regularly attend and give presentations

at pharmaceutical conferences in New Jersey (Statile Cert. Exhibit B), but Pharma Voxx also advertises it services in New Jersey in connection with such conferences. (Id.). Moreover, it is likely that Pharma Voxx obtains many of the materials for its database from the numerous pharmaceutical companies located in New Jersey.

> ## 2. Health IQ Contracted With DTW In New Jersey And Fraudulently Accessed DTW's Database That Is Located In New Jersey

As noted above, from 2004 through 2007, Health IQ contacted DTW in New Jersey and repeatedly entered into contracts with DTW for DTW to provide the services of conducting custom searches and compiling and providing Health IQ with pharmaceutical promotional materials. (Complaint ¶¶ 27 & 29). These contracts were entered into by Health IQ sending orders to DTW in New Jersey via telephone or facsimile, and DTW filled these orders by performing services in New Jersey, including searching its database, compiling and printing out documents in New Jersey. (Statile Cert. ¶¶ 5-7). Once DTW discovered the connection between Health IQ and Pharma Voxx, DTW sent Health IQ a cease and desist letter reminding Health IQ of the proprietary and confidential nature of CD Promo and DTW warned Health IQ to cease and desist any improper activities relating to CD Promo. (Statile Cert. Exhibit C).

After 2007 Health IQ stopped contracting with DTW for its services and decided to surreptitiously obtain this information directly from DTW's database, and without DTW's permission. As admitted by Health IQ, in 2008 and 2009 Health IQ directly accessed DTW's New Jersey based CP Promo database by using usernames and passwords of one of DTW's clients, without DTW's permission. (Defendants' Brief at p. 6). In connection with this unauthorized access, for the period prior to March 2009, Health IQ had to download DTW's proprietary emageX software program in order to access and view the documents contained on

CD Promo. Health IQ knowingly continued to access CD Promo even after DTW sent a cease and desist letter to Health IQ in 2008.[1]  (Complaint at ¶ 36).

### 3.     XiQ Is A Co-Conspirator Or Alter-Ego Of Health IQ and Pharma Voxx

XiQ's contacts with New Jersey were made through its subsidiaries, Health IQ and Pharma Voxx, which are co-conspirator or alter-egos of XiQ.  As noted in Defendants' moving brief, XiQ provides the "administrative infrastructure" for Health IQ and Pharma Voxx. (Defendants' Brief at p. 3).    Although Defendants' do not describe precisely what this "administrative infrastructure" entails, at a minimum, it includes providing the information technology support, including the IP address, to facilitate the conduct at issue in this case.  In addition, XiQ provides office space to Health IQ and Pharma Voxx, and all three Defendants share employees, maintain common ownership, and advertise their services and recruit employees jointly as if they are the same company. (Statile Cert. Exhibits D-J).  For example, despite Defendants' contention that XiQ is "a holding company" that "merely provides infrastructure for its subsidiaries" (Defendants' Brief at p. 3), it is evident that XiQ goes so far as to hire employees for Health IQ and Pharma Voxx.  XiQ has posted numerous job openings for market research analysts (Statile Cert. Exhibit E), and recently posted a job opening for a "Pharmaceutical Content Analyst." (Statile Cert. Exhibit F).   A job posting by Pharma Voxx directs applicants to contact Nitin Gupta at a Health IQ email address. (Statile Cert. Exhibit G).

---

[1] Health IQ suggests that the access was not wrongful because the usernames and passwords were provided by DTW's customers.  This defense, while irrelevant for purposes of this motion, makes no sense for several reasons.  First, Health IQ knew its conduct was improper because DTW's database was password protected and required access via a "click through" agreement that reiterated that it was only for authorized users.  Second, in order to access the database, Health IQ initially needed to download the proprietary emageX software.  Third, Health IQ had already been warned that it should not be securing data from DTW because of its relationship with Pharma Voxx.  Finally, if Health IQ was really using the information for a client, it would have used the database of its sister company, Pharma Voxx

11

Similarly, Health IQ and Pharma Voxx are often listed together as if they were one employer when they attend career fairs. (Statile Cert., Exhibit H).

Most significant is the fact that employees of Defendants indicate that they are employees of all three companies. A review of profiles on the networking website LinkedIn.com demonstrates that employees of one of the Defendants will reference the other Defendants in their professional summaries. For example, Marina Wang lists one of her previously held positions as "Project Manager/Manager, Marketing and Development, XiQ, LLC." (Statile Cert. Exhibit I). **Under that same entry**, she lists her positions as "Manager, Marketing & Development, **Pharma Voxx**" and "Project Manger, **Health IQ**." (Id.) (emphasis added). Another individual, Buffy Malio, lists her title as "Reimbursement Specialist **at Health IQ**" and under current position, she lists "Reimbursement Specialist **at XiQ, LLC**." (Statile Cert. Exhibit J) (emphasis added). Apparently even the employees of Defendants consider the three Defendants to be one in the same.

## LEGAL ARGUMENT

### POINT I

#### THIS COURT HAS PERSONAL JURISDICTION OVER PHARMA VOXX, HEALTH IQ AND XIQ BASED UPON THEIR CONTACTS WITH NEW JERSEY

Defendants do not dispute that there is personal jurisdiction over Pharma Voxx, but argue that Pharma Voxx's parent and sister companies, with whom Pharma Voxx shares an office, employees, administrative infrastructure, advertising and recruiting, should not be subject to suit here. Contrary to Defendants' assertions, the District of New Jersey has personal jurisdiction over each Defendant because the Defendants have the necessary minimum contacts with New Jersey, or in the alternative, because they are co-conspirators or alter-egos of Pharma Voxx.

12

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004). Under New Jersey's long-arm statute, Rule 4:4-4(c), jurisdiction is coextensive with the due process requirements of the United States Constitution. Id. Accordingly, defendants who have sufficient "minimum contacts" with New Jersey are subject to suit there. Id. Where the "court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a *prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." Id.

Due process requires only that in order to subject a defendant not present within the territory of the forum to personal jurisdiction, that he (1) have certain minimum contacts with the forum such that (2) the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322 (1989) (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Milliken v. Meyer, 311 U.S. 457, 463 (1940)); see also World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (stating that to establish personal jurisdiction over a non-resident defendant, a plaintiff must prove that the defendant has minimum contacts with the forum state that the defendant "should reasonably anticipate being haled into court there.").

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. Burke v. Quartey, 969 F.Supp. 921, 924 (D.N.J. 1997). Where the cause of action relates directly to the defendant's contacts with the forum, the forum has "specific jurisdiction." Lebel, 115 N.J. at 322. When a court exercises personal jurisdiction over a defendant in a suit not related to the defendant's contacts with the forum, but rather based upon the defendant's "continuous and systematic" contacts, the court has "general jurisdiction." Id. at 322-323 (citing

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-416 (1984)).  Here, the District of New Jersey has both general and specific jurisdiction over the Defendants.

### A. This Court Has Specific Jurisdiction Over Health IQ and XiQ Due To Their Minimum Contacts With New Jersey

In determining specific jurisdiction, courts focus on the relationship among the defendant, the forum, and the litigation. Miller Yacht, 384 F.3d at 96; Lebel, 115 N.J. at 323.  A court will exercise specific jurisdiction when a defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." Id. at 96.  In other words, a foreign act that is both aimed at and has effect in the forum state satisfies the purposeful availment prong of the specific jurisdiction analysis. Calder v. Jones, 465 U.S. 783, 789 (1984) (holding that it was proper for a California court to exercise jurisdiction over two Florida newspapermen in a libel action arising out of their intentional conduct in Florida which was done to cause injuries to plaintiff in California); see also Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984) (defendant's regular circulation of magazine in forum state was sufficient to establish personal jurisdiction over libel action).

Here, there can be no question that Defendants' activities, as described above and alleged in the Complaint, establish sufficient purposeful contacts with New Jersey and were directed at and had an effect in New Jersey.  Health IQ contacted DTW in New Jersey and entered into contracts with DTW for services to be performed and materials to be compiled in New Jersey. After DTW discovered the connection between Health IQ and Pharma Voxx, DTW sent Health IQ a cease and desist letter reminding Health IQ that the information on CD Promo, including that which was provided to Health IQ, was the confidential and proprietary intellectual property of DTW and that DTW would take legal action if Health IQ engages in unlawful conduct relating

14

to CD Promo.  Thus, Health IQ was well aware that it actions regarding CD Promo could result in Health IQ being haled into Court in New Jersey.

Thereafter, despite DTW's warnings, Health IQ, using XiQ's IP address, continued to unlawfully access DTW's database which is located in New Jersey, and Health IQ improperly downloaded thousands of documents.  DTW believes that both the contracted for and illegally obtained documents were misappropriated by Health IQ by its providing these materials to Pharma Voxx, and that Pharma Voxx used those materials on its database to unlawfully compete with DTW.  Pharma Voxx, who does not dispute jurisdiction, has marketed its services and products in New Jersey resulting in DTW losing New Jersey based clients.

XiQ, as the provider of Health IQ and Pharma Voxx's administrative infrastructure, office space, personnel and other resources, facilitated Health IQ and Pharma Voxx's contacts with New Jersey.  Notably, XiQ provided the very internet resources that Health IQ used to improperly access DTW's database, and presumably, XiQ provides the internet website and other tools used by Pharma Voxx to operate its competing database.  Due to Defendants' combined conduct, DTW has suffered harm in New Jersey.

These facts easily subject Health IQ and XiQ to jurisdiction in New Jersey.  See Burke, 969 F.Supp. at 926 (stating "[w]hen a defendant manifestly has availed himself of the privilege of conducting business [within the forum state], and his activities are shielded by the benefits and protections of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."); Keeton., 465 U.S. at 779 (1984) (charging defendant with knowledge of its laws where it "no doubt would have claimed the benefit of them if it had a complaint against a subscriber, distributor, or other commercial partner."); Maglio & Kendro, Inc. v. Superior Enerquip Corp., 233 N.J. Super. 388, 399 (App. Div. 1989) (jurisdiction

15

was properly exercised over defendant where "the nonresident defendant solicited a transaction with a resident employment agency which defendant knew or should have known would be performed by the agency from its office located within the foreign state."). Based on the foregoing, there can be no doubt that all three Defendants were aware that as a consequence of their purposeful contacts with New Jersey, there was a possibility of litigation arising in New Jersey.

**B.     This Court Has General Jurisdiction Over Health IQ Due To Its Continuous And Systematic Activities In New Jersey**

In addition to specific jurisdiction over all three Defendants, this Court has general jurisdiction over Health IQ due to its continuous and systematic activities in New Jersey. General jurisdiction, which is available where the defendant's activities in the forum state are "continuous and systematic," subjects the defendant to suit on virtually any claim, even if unrelated to the defendant's contacts with the forum. Lebel, 115 N.J. at 323. A state may exercise general jurisdiction over a non-resident defendant if the suit is not related directly to the defendant's contacts, but based instead "on the defendant's continuous and systematic activities in the forum." Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 119 (1995); Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539, 541 (3d Cir. 1985).

As discussed above, Health IQ placed at least eight orders with DTW over a three year period and continuously contacted DTW in New Jersey from 2004 through 2007. Thereafter, during 2008 and 2009, Health IQ repeatedly and continuously accessed DTW's database, which is located in New Jersey. Additionally, Pharma Voxx regularly attends pharmaceutical conferences in New Jersey, advertises in New Jersey and services New Jersey based companies. Inasmuch as Health IQ often advertises jointly with Pharma Voxx and the two companies share personnel, it is quite likely discovery would reveal that Health IQ visits, advertises in, has

16

customers in and conducts business in New Jersey, which would be further support for this Court to exercise general jurisdiction over Health IQ. See Granovsky v. Pfizer, Inc., 631 F.Supp.2d 554, 561 (D.N.J. 2009) (finding that New Jersey had general jurisdiction over defendants that conduct business within the state of New Jersey). Based on Health IQ's continuous and systematic activities in New Jersey, it is subject to general jurisdiction here.

### C.   This Court's Exercise Of Jurisdiction Over The Defendants Comports With Traditional Notions Of Fair Play And Substantial Justice

In light of Health IQ and XiQ's conduct, the exercise of jurisdiction over Defendants in New Jersey comports with traditional notions of fair play and substantial justice. Only rarely will the fairness requirement defeat jurisdiction where a defendant has purposefully engaged in forum activities. Ipoint Ventures, LLC v. Pequot Capital Management, Inc., 2005 WL 1828586, *9 (D.N.J. 2005);[2] see also Miller Yacht, 384 F.3d at 97 (stating "[t]o defeat jurisdiction based on this fairness inquiry, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."). In addressing this question, a court considers "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering the fundamental substantive social policies." Miller Yacht, 384 F.3d at 97.

Here, Health IQ purposefully entered into multiple contracts with DTW, a New Jersey company, and had DTW provide it with numerous documents that were compiled and printed in New Jersey. Thereafter, Health IQ knowingly accessed DTW's CD Promo database without authorization and downloaded thousands of documents therefrom. Health IQ engaged in this conduct after being warned by DTW of the proprietary nature of the materials on CD Promo.

---

[2] Copies of unreported decisions are attached to the Derman Cert. as Exhibits C-G.

Consequently, because Health IQ has purposefully engaged in this conduct in New Jersey and XiQ facilitated Health IQ's actions, jurisdiction over both of them comports with the traditional notions of fair play and substantial justice.

### D.   Defendants Are Co-Conspirators Or Alter-Egos

Even if there is some question as to whether this Court independently has personal jurisdiction over Health IQ or XiQ, the Court's jurisdiction over Pharma Voxx in this matter extends to Health IQ and XiQ as well because Health IQ and XiQ are either co-conspirators or alter-egos of Pharma Voxx.[3]

### 1.   Co-Conspirators

Under New Jersey law, a common law civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005). Here, DTW has alleged that each Defendant played a critical role and performed a substantial overt act in carrying out their plan to steal DTW's proprietary information and unlawfully compete with DTW, thereby causing DTW to suffer harm in New Jersey. Specifically, Health IQ first obtained DTW's confidential and proprietary information through contracts with DTW. Health IQ then obtained additional documents as well as information regarding the inner workings of CD Promo by illegally accessing that database. XiQ provided Health IQ with the resources to carry out these acts, including the internet resources to access CD Promo. DTW alleges that Pharma Voxx used the information obtained

---

[3] As no discovery has been conducted yet, DTW does not yet know if Defendants are co-conspirators or alter-egos. Federal Rule of Civil Procedure 8 specifically allows a party to plead in the alternative: "[a] party may set forth two or more statements of a claim or defense alternately or hypothetically." Fed. R. Civ. Pro. 8(d)(2).

1223800.6

by Health IQ in order to unfairly compete with DTW. Inasmuch as Defendants do not dispute that this Court has jurisdiction over Pharma Voxx, this Court's jurisdiction over Pharma Voxx extends to Health IQ and XiQ as they are co-conspirators with Pharma Voxx.

The "conspiracy theory" of personal jurisdiction is based on the "time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." Dept. Of Treasury, Div. of Invest., v. Qwest Commc'n Int'l., Inc. 387 N.J. Super. 487, 503 (App. Div. 2006) (citing Gemini Enterprises, Inc. v. WFMY Television Corp., 470 F. Supp. 559, 564 (M.D.N.C. 1979) (explaining that connections between the conspiracy and the forum state can provide a sufficient basis for a court to assert personal jurisdiction over a nonresident co-conspirator); see also Matsumoto v. Matsumoto, 335 N.J. Super. 174, 180-85 (App. Div. 2000) (upholding the trial court finding that New Jersey had personal jurisdiction over a foreign national; who interfered with the custody of a parent in this State); Verizon Online Servs., Inc. v. Ralsky, 203 F. Supp. 2d 601, 622 (E.D. Va. 2002) (explaining that a co-conspirator is subject to jurisdiction in a forum where substantial acts in furtherance of the conspiracy were performed by any member of the conspiracy if the co-conspirator knew or should have known that the acts would be performed).

For example, in Blystra v. Fiber Tech Group, Inc., the Court held that the jurisdictional contacts of some defendants with New Jersey can be considered jurisdictional contacts common to all defendants by virtue of the acts that were taken in further of a conspiracy. 2005 WL 2807361, at *6 (D.N.J. Oct. 25, 2005). In so holding, the Court noted that "[s]ubstantial acts in furtherance of the alleged conspiracy which took place in the forum can be attributed to non-forum co-conspirators who were aware or should have been aware of those acts." Id.

Accordingly, in the event this Court determines that Health IQ or XiQ do not have sufficient minimum contacts with New Jersey, this Court may nevertheless exercise jurisdiction over them because they are co-conspirators of Pharma Voxx due to their participation in the plan to steal DTW's confidential information in order to unlawfully compete with DTW and cause it harm in New Jersey.

### 2.   Health IQ And XiQ Are Alter-Egos Of Pharma Voxx

Where the affairs of one corporation are so organized and conducted as to make it a mere instrumentality of its parent corporation, the corporate entity will be disregarded where "the corporate form is used as a shield behind which injustice is sought to be done by those who have the control of it." Mueller v. Seaboard Commercial Corp., 5 N.J. 28, 34-35 (N.J. 1950).   "In New Jersey, a subsidiary will be deemed to be the alter ego or mere instrumentality of its parent if the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." Id.

Here, the three Defendants appear to be one and the same.  They share owners, corporate officers, office space and employees, and they advertise and recruit employees jointly and for one another.  As admitted by Defendants, XiQ provides Health IQ and Pharma Voxx with administrative infrastructure, including that tools used by Health IQ and Pharma Voxx to carry out the actions at issue in this case.  Also, as explained above, employees of one of the Defendants consider themselves to be the employee of all three Defendants, and they use the name of all three interchangeably when stating the name of their employer.  This indicates that even the Defendants' employees recognize the Defendants as being one in the same. Accordingly, this Court's jurisdiction extends to Health IQ and XiQ because they are the alter-egos of Pharma Voxx.

20

E.     **In The Event The Court Finds More Facts Are Needed To Resolve The Issue Of Personal Jurisdiction, The Court Should Order Jurisdictional Discovery**

For the reasons discussed above, DTW has made a *prima facie* showing of personal jurisdiction over Defendants, and this case should move forward before this Court. In the event this Court finds any question exists as to this issue or desires a more complete record to render its finding, it is respectfully requested that the Court order jurisdictional discovery. See Cacioppo v. Pool Mart Servs., Inc., 2007 WL 2162427, at *4 (App. Div. July 30, 2007) (stating "at this early stage of the proceedings, however, if the pleadings and certifications suggest jurisdiction, at a minimum, jurisdictional discovery or an evidentiary hearing should be conducted rather than a dismissal."); Carroll v. United Airlines, Inc., 325 N.J. Super. 353, 367 (App. Div. 1999) (stating "although we are inclined to think there may be sufficient basis for in personal jurisdiction over [third-party defendant], that conclusion may not be without question. We are convinced, therefore, that [third-party plaintiff] should be permitted to engage in jurisdictional discovery before the issue is finally resolved."); Makopoulos v. Walt Disney World, Inc., 221 N.J. Super. 513, 518 (App. Div. 1987) (remanding for further discovery to determine whether solicitation provided a basis for personal jurisdiction).

Thus, if there is any question as to personal jurisdiction over the Defendants, this Court should order jurisdictional discovery before deciding Defendants' motion.

**POINT II**

**THE DISTRICT OF NEW JERSEY IS A PROPER VENUE, AND DEFENDANT'S MOTION TO DISMISS THIS CASE UNDER THE DOCTRINE OF *FORUM NON CONVENIENS* SHOULD BE DENIED**

Despite the plethora of contacts by Health IQ and Pharma Voxx, and DTW being located here and commencing this action here, Defendants argue that New Jersey is an inconvenient forum. Defendants' argument has no merit. Courts have consistently ruled that the doctrine of

21

*forum non conveniens* "must be sparingly applied, inasmuch as its application results in the dismissal of an action over which the court has jurisdiction and ordinarily would have a duty to resolve." Burke, 969 F.Supp. at 928. The *forum non conveniens* analysis involves two steps: "first, the court determines whether an adequate alternative forum exists; second, the court balances the public and private interest factors which weigh for and against each forum." Burke, 969 F.Supp. at 929. These interests are:

> Private interest factors include: (a) relative ease of access to sources of proof; (b) availability of compulsory process for attendance of unwilling witnesses; (c) costs of obtaining witnesses, and (d) practical considerations that make trial of a case easy, expeditious, and inexpensive.
>
> Public interest factors include: (a) administrative difficulties flowing from court congestion; (b) the interest in having local disputes resolved at home; (c) the interest in having a case tried in the district which is familiar with applicable laws; (d) avoidance of unnecessary problems in conflicts of laws, and (e) the unfairness of imposing jury duty upon a community with no relationship to the litigation.

Burke, 969 F.Supp. at 929. The burden is on the defendant to satisfy both components of the analysis and establish a strong preponderance in favor of dismissal. Id.

Application of this analysis demonstrates that this case is properly before this District Court. Most important in this analysis is the fact that DTW chose this forum. In determining whether to decline jurisdiction under the doctrine of *forum non conveniens*, substantial weight and deference is given to the plaintiff's choice of forum. Id. When a plaintiff selects the forum in good faith and when evidence on some of the substantial issues are in or closer to New Jersey, "the plaintiff's choice should not be denied on a mere weighing of relative conveniences." Starr v. Berry, 25 N.J. 573, 587 (1958). "It is not enough that a defendant will be seriously inconvenienced; it must also appear that a transfer will not result in significant hardship to the plaintiffs." Berry, 25 N.J. Super. at 587. Indeed, courts have held that the original choice of

22

forum must be "demonstrably inappropriate." D'Agostino v. Johnson & Johnson, Inc., 225 N.J. Super. 250, 262 (App. Div. 988), aff'd, 115 N.J. 491 (1989) (denying defendant's motion to dismiss for *forum non conveniens* because "plaintiff's choice of forum was not shown to be 'demonstrably inappropriate.'"); Yousef v. Gen. Dynamics Corp., 2010 WL 770488 (App. Div. Jan. 13, 2010) (stating "[b]ecause plaintiffs' choice of a New Jersey forum was not 'demonstrably inappropriate,' the judge did not abuse his discretion in denying the motion to dismiss on *forum non conveniens* grounds . . . ."). "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." D'Agostino, 225 N.J. Super. at 262.

DTW chose this forum in good faith because DTW is located in New Jersey and the conduct and harm at issue in this matter occurred in New Jersey. This fact, as well as a balancing of the public and private interests, demonstrates that this case should remain in New Jersey. The private interest factors cited by Defendants do not overcome the strong presumption in favor of DTW's choice of forum. Indeed, the private interests weigh in favor of New Jersey because much of the relevant proof, such as DTW's database and records are located in New Jersey. Likewise, DTW and its witnesses are located in New Jersey, and thus there will be minimal costs of obtaining witnesses. Although the Defendants are located in California, Pharma Voxx and Health IQ transact business in New Jersey, and Pharma Voxx regularly travels to New Jersey for conventions. (Statile Cert. Exhibit B). As for XiQ, in August of 2008, XiQ initiated a litigation in the Southern District of New York, which demonstrates that traveling here for litigation is not too inconvenient for XiQ. (Derman Cert. Exhibit B). Moreover, DTW would face the same expense and inconvenience, if not more, if forced to litigate in California as Defendants claim to face litigating in New Jersey. See Burke, 969 F.Supp. at 930.

Similarly, Defendants fail to identify sufficient public interest factors to warrant dismissal. New Jersey has a clear interest in hearing DTW's claim because the harm was caused in New Jersey to a New Jersey company. Likewise, a New Jersey jury would have a connection to this litigation. New Jersey common law and statutory law is at issue in the complaint, including the New Jersey Computer Fraud statute, and thus, interest in having a case tried in the district which is familiar with applicable laws weighs in favor of keeping this matter here.

Based on the foregoing, Defendants' motion to dismiss pursuant to the doctrine of *forum non conveniens* should be denied because New Jersey is an appropriate forum and Defendants have not met their heavy burden of establishing that New Jersey is a "demonstrably inappropriate" venue.

**POINT III**

**A BALANCING OF THE INTERESTS WEIGHS
STRONGLY IN FAVOR OF KEEPING THIS MATTER IN
THE DISTRICT OF NEW JERSEY AND THEREFORE
DEFENDANTS' MOTION TO TRANSFER TO THE
CENTRAL DISTRICT OF CALIFORNIA SHOULD BE
DENIED**

Nor should this case be transferred to the Central District of California because Defendants have not met their burden of demonstrating that a balancing of the interests weighs in favor of a transfer out the District of New Jersey. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). However, "[i]t is well-settled that the burden on a § 1404(a) motion must be borne by the party seeking to transfer the case, and that the motion must not be lightly granted." Yocham v. Novartis Pharmaceuticals Corp., 565 F.Supp.2d 554, 557 (D.N.J. 2008); see also Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970) (noting that "[t]he decision to transfer is in the court's discretion, but a transfer is not

to be liberally granted."); Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995) (noting that the burden of establishing the need for a transfer rests with the movant).

When determining whether to transfer venue "courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Yocham, 565 F.Supp.2d at 557 (quoting Jumara, 55 F.3d at 879). Although there is no definitive list of the factors to consider courts have considered many private and public interests protected by the language of § 1404(a):

> The private interests have included: plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses - but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

> The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

Jumara, 55 F.3d at 879-880 (internal citations omitted).

Here, as described in the *forum non conveniens* discussion in Point II, supra, both the private and public interests weigh in favor of keeping this case in New Jersey. In addition, foremost among the Court's concern in the venue analysis is DTW's decision to file this action in New Jersey. "It is black letter law that a plaintiff's choice of a proper forum is a paramount

1223800.6

consideration in any determination of a transfer request, and that choice should not be lightly disturbed." Shutte, 431 F.2d at 25 (citing Ungrund v. Cunningham Brothers, Inc., 300 F.Supp. 270, 272 (S.D.Ill.1969)); see also Jumara, 55 F.3d at 879 (noting "in ruling on defendants' motion the plaintiff's choice of venue should not be lightly disturbed."); Clark v. Burger King Corp., 255 F.Supp.2d 334, 338 (D.N.J. 2003) ("unless the balance of inconvenience of the parties is strongly in favor of Defendant, [Plaintiff's] choice of forum should prevail."). "In light of the 'paramount consideration' accorded to a plaintiff's choice of venue, courts in this district have recognized that unless the balance of inconvenience of the parties is strongly in favor of Defendant, Plaintiff's choice of forum should prevail." Yocham, 565 F.Supp.2d at 558 (citations omitted). Defendants' motion to transfer should therefore be denied as well.

## POINT IV

### DTW SUFFICENTLY PLEADED THE FRAUD AND BREACH OF CONTRACT CLAIMS AGAINST PHARMA VOXX AND ALL CLAIMS AGAINST XIQ, AND THUS, NONE OF THE CLAIMS SHOULD BE DISMISSED

Although they do not specify upon what grounds they are moving, it appears that Defendants' are arguing that all claims against XiQ and the breach of contract claim as to Pharma Voxx should be dismissed for failure to state a claim. When considering a motion to dismiss for failure to state a claim, the court "must accept as true all well-pleaded factual allegations in the complaint, and view them in the light most favorable to the plaintiff." Ross v. Celtron Intern., Inc., 2006 WL 2591083, *2 (D.N.J. Sept. 8, 2006).

Here, Defendants do not claim that the causes of action are inadequately alleged, but that the facts are not pleaded specifically enough as to XiQ and, for the breach of contract claim, Pharma Voxx. DTW, however, alleges that the fraud and breach of contract was committed by all of the Defendants. Plaintiff has also alleged that the XiQ, Pharma Voxx and Health IQ are

alter-egos or co-conspirators. Indeed, the facts available at this stage demonstrate that this is more than "speculation without support." XiQ provided all the administrative, technical and other support to Health IQ, and the companies worked together and/or are interchangeable. Consequently, the actions by one are attributable to the others. See Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 366 (App. Div. 1993) (noting that acts and declarations of a conspirator in furtherance of the conspiracy are binding on all parties to the conspiracy, and once a conspiracy is formed, each conspirator, while a member of the unlawful combination, is liable for every act of each conspirator done in pursuance of the conspiracy). As DTW has sufficiently pleaded conduct by the Defendants for each claim alleged in the complaint, no clams should be dismissed as to any of the Defendants at this juncture.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss or transfer venue should be denied in its entirety. If this Court finds that more information is needed to decide Defendants motion, DTW respectfully requests that this Court order jurisdictional discovery before granting Defendants' motion.

Respectfully submitted,

WOLFF & SAMSON PC
Attorneys for Plaintiff
dtw Marketing Research Group, Inc.


By: */s/ Adam K. Derman*
ADAM K. DERMAN

Dated:  March 22, 2010

27